In banker hearing in Navajo Nation v. USFS and Arizona Snowball Resort. Counselor, you may proceed. May it please the court. My name is Jack Trope and I am attorney for three of the plaintiffs in this case. Walpae Nation, Norris Nez, and Bucky Preston. As you know, this is a consolidated case and so there are attorneys for other sets of plaintiffs. We will be dividing our time equally. Mr. Scarborough will address RFRA. Just keep an eye on the clock. This being an in-bank case, we can't go over, so whatever time you have on the clock. Okay. All right, why don't I proceed. I'm going to address my remarks to the Religious Freedom Restoration Act. And what this case is about is the application of RFRA, as that act is known, to a project approved by the Forest Service that would allow for snowmaking with the use of treated sewage effluent for that snowmaking. Counsel, why isn't this case absolutely and totally controlled by LING? Your Honor, because of the plain words of the statute. The statute provides that the test we applied under RFRA is to be the test that was applied in the Sherbert case and in the Yoder case. The LING case never applied that test. If you look at the Smith case, it talks about cases which categorically excluded whole areas from the Sherbert case, military, prisons, and federal land management. Well, there's no coercion in this situation. It's very much like LING. There the Forest Service wanted to build a logging road across Chimney Rock. Here the issue is another sacred area, but government-owned. And LING tells us that unless there is some sort of coercion, there is no restriction on the government's use of land. In fact, if we go too far in one direction, we get into an establishment clause problem. Well, Your Honor, RFRA is not identical to the First Amendment. And when you look at RFRA, the court's Ninth Circuit has been clear that RFRA goes beyond the First Amendment. So when we're looking at the substantial burden test that this court has derived in cases like Bryan v. Gomez and Guam v. Guerrero, there is no threshold test of coercion. That so-called coercion test is derived from LING, but LING was a categorical exclusion case. No, it was derived from Sherbert. The coercion test actually was ---- Sherbert and Yoder both involved coercive statute, which LING recognized. But those cases did not require ---- I mean, if you look at the analysis of those cases, they do not talk about coercion as a prerequisite. It's the impact on the religious practice. And I think that this court, if you look at the test this court has applied, it has looked at cases like Thomas, cases like Hobby that followed Sherbert, and the test has not involved coercion as a prerequisite. The test, for instance, in the Bryan case, is government action that prevents a practitioner from engaging in conduct or having a religious experience. The interference must be more than an inconvenience. In Guam v. Guerrero, the test is substantial pressure on an adherent to modify his behavior and violate his beliefs. There is no threshold test of coercion. Isn't it? But it's ---- Well, if you define coercion in that way, then we meet that test. Then the testimony is that there is substantial pressure on an adherent to modify his beliefs. Can you walk through this a little bit more slowly for me? Sure. LING is a Supreme Court case. Correct. We are a step below. Correct. So we must follow. LING is a First Amendment case. You are applying RFRA. You are not applying ---- Let me, let me. I'm sorry. You're just wasting time. Insofar as it's binding, we must follow it, right? It's binding, yes. A Supreme Court case that's binding, we must follow. Yes. Okay. Now, are you taking the position that something happened since LING that made LING inapplicable? Yes, the passage of RFRA. So your view is that RFRA expands, goes beyond Sherbert, beyond the doctrine, the priest-myth doctrine. No, it does not go beyond Sherbert. What RFRA did was enact a, you know, let me walk through some of the history of ---- No, no. It, that RFRA did more than simply restore the law to a priest-myth status. Correct. It actually did more than that. Correct. Can you explain to me what specifically in RFRA, what language in the statute did that? Sure. If you look at the history of how the purpose section in RFRA was developed ---- Okay. I asked you for language. Okay. Statutory language. Is there some text? Yes. The language says that the substantial burden test should be applied consistent with Sherbert and consistent with Yoder. In earlier drafts of the bill that passed the House, the language was that the purpose of this bill was simply to overturn Smith. And there was a debate about that. You're getting into legislative history, which is fine. I'm not, I'm perfectly willing to go there with you. I'm asking you for statutory language. Is there something in the actual words and phrases that Congress voted on or the President signed into law that you are relying on? Yes. We are relying on the fact that the purpose of this bill, in the purpose section, it says the purpose of this bill is to apply the compelling interest test in Sherbert and Yoder to all cases in which a government action imposes a substantial burden on religious practice, religious exercise. Sherbert and those cases ---- So you're taking the purpose language of the act as having more than, having an actual legally operative effect. Yes. We believe that that gives guidance to courts about what the meaning of substantial burden in the act is. Counsel, I'm wondering if we can go as far with the logic of RFRA as you want without an establishment clause violation. I understand your argument that Ling wasn't interpreting RFRA. I understand your argument that if you look at the legislative history, RFRA was meant to expand accommodation for religion beyond what the free exercise clause alone does. However, it seems to me that what you're seeking is basically a rule that federal land cannot be used in a way that desecrates Native American religion. No, not at all. If we had a rule like that, let's suppose we adopt a rule like that. It would definitely be post-Ling because Ling was building a paved road across a holy site. But let's say that's the rule. It seems to me that if we had it for only one religion, Native American religion, it would be an establishment clause violation and an equal protection violation. If we had it for all religions, it seems like it would be an establishment clause, and I think it's a realistic problem. I'm thinking we get cases every year on the Burning Man Festival and on the Rainbow Coalition, and they both do a lot of activities outdoors on federal land that Muslim Sabbath observers on Friday and Jewish Sabbath observers on Saturday and Christian Sabbath observers on Sunday would regard as a desecration. If we stop them, and this is federal land, not anyone's church or synagogue or temple, if we stop them because of the desecration of the Sabbath, it seems like that would be an establishment clause violation. But that's not what we're saying here. What we're saying here is that the RFRA statute gets applied in the same way, no matter what the circumstances are. So first you have to show what the impact is on your practices. You have to show if those practices would be affected. You would have to show the context of those practices so that a court could determine that it was substantial and not simply an inconvenience. At that point, as was indicated in the Ocentro case and in the statutory findings, you apply a balancing test. So we have kind of an inquisition about each religion and find out what their beliefs are? No, not at all. I mean, they are the arbiters of their beliefs, but what you are the arbiters of is, is there evidence that there's impact on this practice? In the context of all the testimony that's been presented, is the impact on that practice, on that religion, substantial? If so, what is the government's interest on the other side? If the government's interest exceeds that of the religious practitioners, the government wins. If the government, as in this case, has a very marginal interest and the impacts are very profound, which is something that not only the testimony indicates in an uncontroverted fashion, but the Forest Service has acknowledged in its own documents, a devastating and irreversible impact. Could it work for new religions? It could work. So if we had a new religion of Gaia, where any development on federal land was a desecration, that would work? Well, you would have to test the sincerity. Assume it's sincere. I see no reason to doubt the sincerity. As Chief Justice Roberts said in Los Angeles, the compelling interest test is one that works on a case-by-case basis. So if you have an elaborate claim that's going to place incredible burdens on the government to meet, then clearly that individual is not going to win that case. Just like in the Lee case involving the Amish and Social Security system under the First Amendment, all of these cases where there's a tremendous impact on the government, the government wins. And even under RFRA, I mean, if you get yourself in the door, which is what we're saying here is RFRA intends everyone to get in the door. How do you make that decision as to whether it has a tremendous impact on the government? This would, of course, seriously interfere with this particular government program. If they want to go forward with it, this program would be severely affected. Well, all that would be affected here is the use of treated sewage effluent for snowmaking. Skiing would continue. Multiple use would continue. So the additional government interest is... Not on the scale that the government wishes to allow it. So there's no doubt that this particular project would have very serious consequences. I see my time is up, but I will answer that question before I sit down. All I would say is that if RFRA means anything, it must mean that the government has to make some accommodation in what it does. So if what this means is it can't have the fullest possible skiing area on the peaks in order to accommodate under RFRA, then that's what RFRA does. It would be an establishment cost problem, perhaps, if no activity whatsoever were to be allowed in that area. But this is not what we're talking about at all. Out of respect for my co-counsel, I should sit and give them an opportunity to address the court. Thank you. Thank you. May it please the court. My name is Jim Scarborough, and I'm an attorney for the Hopi tribe. I just want to let the court know that there are several members of the Hopi tribe here today, including the chairman, Ben Navamsa. At the risk of sticking my head into the lion's jaws, Your Honor, I want to take a crack at the question you raised about statutory interpretation, because I think this case turns on statutory interpretation. It doesn't turn on the First Amendment. Congress did not adopt the Ling test. Congress rejected Smith. It didn't adopt Ling. In Ling, Justice Scalia says, characterizing Sherbert, he says substantial burden. He doesn't say coercion. He says substantial burden. When you look back at Justice Brennan's opinion in Sherbert, he says… You said you were going to talk about the statute, but you're now talking about other things. Okay. Very good. How about we talk about the statute? All right. Okay. Very good. I have a statute in front of me, and I don't see it at all. I didn't quite get it. The statute uses the words substantial burden. Those words are not limited. I'm sorry. You're no longer looking at the purposes section. No, I'm not. I'm looking at the language, the actual language of the statute. Okay. So what is the full language? And the language of the statute says that a government may not impose a substantial burden on the free exercise of religion in the absence of a compelling interest that is exercised by the least restrictive means. I look at the word… But Ling tells us that that doesn't apply at all when the government is using its own property. There's no such language in the statute, Your Honor. The language does not limit its application to nongovernmental property. It doesn't limit it to governmental property. It doesn't limit it to any kind of property. It doesn't limit the nature of the burden. It doesn't say categorically that one kind of burden qualifies. So if I understand correctly, what you're saying is even though Congress passed a statute against the backhand of Smith and mentioned specifically, mentioned Sherman v. Verner, mentioned Wisconsin v. Yoder in the statute itself, it overruled Ling, another Supreme Court case in the area, without ever mentioning Ling or saying anything directly about it. That's your position. No, that's not my position. I don't think Ling is a clear case. It is not at all clear from Ling where the court is coming from, whether it is saying categorically that certain kinds of functions are not subject to a free exercise challenge. That's the way Justice O'Connor reinterpreted Ling and her concurrence in the Smith case. That's interesting, but it doesn't really matter. Either Ling stands or it doesn't stand. If you want to talk about Ling is still good law and we can distinguish it, we can have that conversation. But I take it what you are saying is Ling is no longer good law. Not under RFRA. Okay, so that gets back to my question. Your position is that even though Congress mentioned Sherman v. Verner, mentioned Wisconsin v. Yoder, mentioned Smith, it overruled another case, Ling, which you say is no longer good law without ever mentioning it. Is that your position? My position is that the language of the statute necessarily says that Ling, interpreted as a coercion case, is not applicable to RFRA. There is nothing in RFRA that uses the word coercion. Let's talk about substantially burden. The exact text is government shall not substantially burden a person's exercise of religion, etc. What is the substantial burden in this situation? There is the use of this treated water to make snow. Suppose the water were not treated at all, it was absolutely rainwater. What about that? Is that a substantial burden?  In other words, use of any kind of activity for skiing purposes or something that would support this ski activity? Snowmaking, Your Honor. Snowmaking as such? Yes, Your Honor. Snowmaking as such. And then the presence of What if absolutely pure water were brought to the site and used to make snow? That would be offensive. That is the position of the Hopi tribe, Your Honor. It is not the position of other plaintiffs in the case. They object specifically and directly, as I understand it, to the use of treated effluent water. The Hopi tribe has a double objection. One is to the making of artificial snow, and the second is to the treated effluent. Both are objections. What RFRA means, Your Honors, I submit, is that you have to go through a case-by-case analysis. You are not obligated to find a substantial burden. You are not obligated to find the absence of a compelling interest. But you are obligated to make the inquiry and not to treat claims under the Free Exercise Clause in a categorical fashion. Is there any governmental action that you can conceive of that would not then be challengeable under somebody's conception of religion? Potentially. Well, Your Honor, no. I cannot. If it's a motion to dismiss, the answer is no. If the government wants to deploy troops to Iraq, then it could be against somebody's religion. And then we'd have to have a hearing in district court somewhere as to whether or not you laughed. I'm not. I don't mean to laugh. Because that one gave me. You do think it's funny. What makes it curious is the fact that, in fact, your rationale would take us that far. If somebody can express an honest belief, even in your religion, I think you answered Judge Planfield's question, that's sincerely held. And it says, I believe that having troops in uniform, mining of ores, payment of Social Security, socialized medicine, anything the government wants to do. If somebody can claim that it's a burden on the religion, we have a case that can be litigated in district court. And then we have nice, fine layers of distinction. Some people think it's only treated water. Some people think it's any water at all. If somebody else comes along and says, I don't want anybody walking on the mountain who isn't a Hopi or a member of a particular tribe, then that burdens my religion as well. That could be a valid claim as well. It could be, Your Honor. It could be. RFRA requires the inquiry to be made. As Chief Justice Roberts says in the El Centro case, he walks through the analysis. Congress has rejected the idea of categorical distinctions. You get the first base. If you make a free exercise claim, whether that claim is valid, whether there's a substantial burden is an inquiry that you have to make. Counsel, I'm very uncomfortable with this inquiry suggestion. And let me tell you why. It seems to me that under the doctrine of constitutional avoidance, what we would do is say Lynn controls if it's government land. RFRA controls if it's a government activity not on government land. If it's government land, you don't need an inquiry. If we do get into the inquiry on government land, there's always going to be quite a significant burden on government because it is, after all, the use of their own land. That, it seems to me, would force us into a very detailed inquiry into people's religions and force us to issue injunctions to government agencies to probe into people's religions in order to determine what their activities should be. That's just the sort of entanglement in religion that most of the Establishment Clause jurisprudence says we ought to keep out of, excessive government entanglement. It seems to me that what your rule, Lynn, is basically inapplicable. We should just look at RFRA and in every case on government land, balance the burden to the religion against the burden to the government. It forces a tremendous entanglement by government and people's religions. Every agency will be probing into sincerity and beliefs and doctrine and theology and all these things that we don't like the government to ask about. Your Honor, there's an entanglement issue whether it's government property or not. I don't see why. Well, I mean, there's a potential for an issue of establishment no matter what you do. Well, the nice thing about it not being government property, I can hold whatever kind of religious observances I want on my land or on land that my religious denomination buys. The government has no say. It asks no questions, and we cannot demand that the government operate its facilities. For example, no alcohol in government buildings. Well, there are Catholic and Jewish sacred rites that require wine. We can't insist that the government let us drink wine there. The property line is nice and neat and involves no entanglement in religion. All right. Your Honor, my time is up. I don't want to intrude on that. Could you just respond to why the constitutional avoidance doctrine wouldn't just encourage us to use the property line to avoid excessive entanglement? Well, Your Honor, first of all, I don't see that Congress, the way I read the statute, draws no such distinction. I don't think that there is an entanglement issue in this case. Perhaps there could be an entanglement issue in other cases. But if the court is prepared to look at this case and find in favor of the plaintiffs, I don't see an entanglement issue in this case. There may be an entanglement issue somewhere. If there is an entanglement issue somewhere, I take your point. But I think what Congress is asking the courts to do, Congress is showing a high degree of solicitude for religious values. And it is asking the court to walk down a road. And that road requires taking a look at the free exercise claim and going through the analysis. There is a parade of horribles. There's no doubt there's a parade of horribles. But this statute was passed in 1992. The parade of horribles has not come true. Congress can change the law if the law is flawed in some way. This is not a constitution we're interpreting. Thank you. Thank you. Thank you, Your Honors. My name is Howard Shanker. I represent the Navajo Nation, the White Mountain Apache, the Avapai Apache, the Havasupai Tribes, the Sierra Club, and others. I would like to acknowledge the fact that Lawrence Morgan, the Speaker of the Navajo Nation, and other tribal dignitaries are here with us today. My goal was to try to address three of the NEPA issues that we raised on appeal. Are you prepared? I would, however, be happy to answer any. Are you prepared? I was going to ask one of your predecessors, but I figured I'd wait my turn. Does counsel have a unified definition of the substantial burden test that you would have us apply or adopt if it's different from the panel formulation? What would you describe as the substantial or articulate as the substantial burden test? First, I'd like to concur with my counsel on the fact that RFRA states that if the government puts a substantial burden on the exercise of religion, that's what it says. It doesn't say that it prohibits religion. It doesn't say that it coerces or penalizes. And if you look at the plain language of the statute, I think, and you interject some common sense into what a substantial burden is, then you can come up with the definition in the briefs. I recommended adopting the same definition that was applied to the same language under RLUIPA. I understand that impacts private property, but it does interject some common sense into the definition. And remember, in this case, the federal government found, and I'll quote, that snowmaking and the expansion of facilities, especially the use of reclaimed water, will contaminate the natural resources needed to perform the required ceremonies that have been and continue to be the basis for the cultural identity for many of these tribes. Now, if you just apply common sense in the plain language of the statute, which should be our guiding principle, that's a substantial burden. But as far as the specific definition, obviously, I'm not sure how else you would apply it in other situations. Well, you've got testimony in the record. This is testimony from Foster. We would not be able to go there to obtain herbs or medicine to do our ceremonies because that mountain would then become impure. It would not be pure anymore, and it would be devastation for our people. I mean, if you believe it, that sounds like a substantial burden. You may not believe it, but there's uncontradicted. I want to come back to the question that seems to be now the government's central argument that seemed not to have been their central argument when it was before the panel. The government now seems to be arguing, and we've heard this before in the questioning, that there is a virtual categorical exclusion from RFRA and its amendment by RLUIPA for any governmental use of its own property. How do you respond to that? The statute clearly does not mention a categorical exclusion. It says that this balancing test is to be implied in all cases where there's a substantial burden. RFRA was passed to expand the protections that were provided to the First Amendment. With the passage of RLUIPA, those protections were expanded even further, yet the defendants are urging the court to adopt the most restrictive application of the First Amendment law. I'm sorry, sir, what do you do with Lange? I'm sorry, Your Honor? What do you do with Lange? I mean, I've heard what other counsels do with Lange. What do you do with Lange? Well, I agree. This is a Supreme Court case, after all. If we wanted to write an opinion agreeing with you, we'd have to say, and Lange is? Lange was a First Amendment case. It did not look at the statute. It didn't look at the statutory language or the plain meaning of the statute. And, in fact, in Lange, the court acknowledges that the project proposed would have a significant adverse impact on the tribes. They just go on to hold that it's non-constitutional. Well, whether our claim is non-constitutional or constitutional really doesn't matter because we're not looking to the First Amendment for relief. Even if you were correct in that, why wouldn't the government's use of its own land, managing it for all citizens rather than just for some, be a compelling government interest? Well, as this court has held in the past, and I'll quote, because of the unique status of Native societies in North American history, protecting Native American shrines and other culturally important sites has historical value for the nation as a whole. That was in the Troyer Regiment. Why wouldn't it be a compelling government interest for the government to manage its own land, as Lange emphasizes, for whatever purpose it wishes? Well, Your Honor, in certain instances, it very well could be. In this instance, it's not. And, in fact, the government will continue to manage this piece of land the exact same way that it has always managed it. This would not impact government land management decisions. And if you look at, I believe it was the Access Fund.  Sorry, Your Honor? If it doesn't impact their decisions, why do you think there are government lawyers on the other side? I'm not sure I understand the question, Your Honor. They must think it will impact their decisions. They've got lawyers arguing on the other side. Well, in fact, Nora Rajour, the forest supervisor on the stand, admitted that she would still be able to manage this land for public recreation, whether or not this proposal went through. Can I ask you a question about the water? The Arizona Department of Environmental Quality has said that this water is suitable for snowmaking. Why isn't the Forest Service's reliance on that, whether you agree with it or disagree with it, why isn't that sufficient to take the hard look? Well, thank you, Your Honor. Actually, what they say here in the beginning is, you know, we'll let snow make our children sick, and the Forest Service says we're going to do a thorough NEPA analysis, and they don't do it. There's no analysis in the record at all. And then at the end of the day, they say, well, ADEQ approved this for snowmaking. They approved it at the request of Snowball, but they approved it for snowmaking. And because of that, we assume that ADEQ carefully considered the impacts. And the we assume is a direct quote. There's absolutely nothing in the record that shows ADEQ considered that people or children would eat this snow. Well, I thought there was something in the record which suggested they were going to put up warning signs. Well, yes, Your Honor. In the same response to comments, what they say is we're going to put up warning signs, and it's up to the grownups to make sure that the kids don't eat the snow made from the reclaimed sewer water. And because ADEQ approved this project, we assume that they considered the impacts. What if the water that was imported was not water that was created through a reclamation plan? Well, in this case, it's important to understand that what they call A-plus wastewater is not potable water. It could be treated. I didn't ask you that question. I'm not talking about that. What if potable water were moved up there, a pipeline? Well, then there'd be no need for the sign, and it wouldn't be any health impact. Well, would there be a problem then with your client? Not with regard to NEPA, no. I mean, what we're talking about as far as relying and abdicating the federal government's responsibility to comply. Under RFRA. Under RFRA? They said they brought absolutely pure water there, no organic material. Well, to some of my clients. Perfectly suitable drinking water. You'd be glad to drink it. Well, Your Honor. Would that be a problem? To some of my clients, it would be. To some, it wouldn't be. But the fact remains that we do live in a desert, and that may not be a wise allocation of clean water. But there would still be a substantial burden in the eyes of many of the tribes here in this courtroom today. Well, they could take the reclaimed water that goes up there and run it through double osmosis, and it'll come out absolutely pure and clear and totally safe. Yes, it would, Your Honor. And as I said, to some of the tribes here today, there would still be a substantial burden if they were making artificial snow. To some of them, they wouldn't. Under RFRA, which I didn't get to address. But that's not the question now in front of us. If we get to the substantial burden question, it is not whether pure water would be, but rather whether treated sewage effluent would be a substantial burden. Isn't that the question? Yes, Your Honor. Thank you. And what we do have to ask. It's not the question Josh Ferguson asked, but it is a question. Thank you. We'll hear from the other side. Good afternoon, and may it please the court. My name is Lane McFadden, and I represent the United States Department of Agriculture Forest Service. I'll be ceding the last 10 minutes of my time to Ms. Stetson, who is the counsel for the Intervenor Arizona Snow Bowl Resort. Your Honor, this case presents the question of whether the government's conduct of its own affairs on its own lands, which incidentally, yet nevertheless adversely affects someone's spiritual relationship to those lands, can be said to impose a substantial burden on those religious adherents in the form and in the nature which triggers the compelling interest test required by the Religious Freedom Restoration Act. The answer must be no. The plaintiffs have not challenged the numerous factual findings that the district court found, which ultimately led it to conclude that after the Snow Bowl project upgrade, the practitioners would still be able to engage in all the religious exercises which they described at the court. The plaintiff's claim is only that the spiritual efficacy of those exercises will be diminished. Don't you think it's kind of insulting to take reclaimed water that's got organic material in there, probably some giardia and other harmful microbial life, and put it on a mountain that some folks there believe is a very holy place? Your Honor, certainly the plaintiffs... Would you drink that water? Your Honor, I... Would you want your kids to play in it? I would let my kids play in that water, yes, Your Honor. You would? Well... Yes, Your Honor, I would. Even though the signs say you're not supposed to? Yes, Your Honor. What other laws would you violate? I don't think it's useful to go off the record like this. Why don't you continue with your argument? Well, Your Honor, to answer your first question, yes, the plaintiffs do find it insulting. They find it deeply offensive. And that is precisely the point, that a government program, a government operation on its own lands, which offends religious beliefs, and here they're clearly, sincerely held religious beliefs. That is not the type of impact on religion, to use my opposing counsel's words, which is a substantial burden under the Free Exercise Clause, certainly. And RFRA does not change the substantial burden inquiry in any way. Let me ask you this, because this has been a question that we've had to oppose already a couple of times, and I want to make sure I understand the government's position. Is it your position that the substantial burden test is simply never triggered when the government is using its own land? That it's simply outside of the coverage of RFRA if the government is using its own land? No, Your Honor, that is not our position. So the use of government land has the potential under RFRA to impose a substantial burden? It is possible that certain governmental actions on government land could still substantially burden religious ideas. And would then violate RFRA if there were no compelling state interest? Correct, yes. So the only question in your view in front of us is, okay, is this a substantial burden? And if so, is there a compelling governmental interest? That's correct. Those are the questions before you. But I think that the fact that it's on government land is an important... I'm not sure I understand. You said that some could. Do you say that this one does? No, Your Honor, this one does not. So your answer to Judge Fletcher's third question should have been, doesn't apply in this case, right? The answer to whether... What you said is that there are some activities on governmental land that might have an impact on the RFRA. Yes. But I didn't hear you say that this was one of them. You're right. This one is not. No, I didn't hear him say that either. You're saying this one is not. How do you draw the distinction? If you don't use the property line and the statement by the Supreme Court in Ling, whatever rights the Indians may have to use of the area, however, those rights do not divest the government of its right to use what is, after all, its land. And Justice O'Connor italicized its to emphasize it. If you don't use that as the rule, what do you use as the rule to determine how to apply RFRA to government land when a religion's exercise is in some way interfered with? You have to look at Supreme Court jurisprudence pre-Smith which interprets substantial burden and which says that substantial burden is only placed on a religious believer when there is substantial pressure placed on them to modify their beliefs, either through the imposition of a criminal penalty or the withholding of an important governmental benefit. The Supreme Court has always recognized that direct regulation of a person's activities could substantially burden their religious practice or their overt religious actions. There's no doubt here that this is a holy site. That's correct, Your Honor. There's no doubt about that. Do not dispute that at all. There's no question about that. And it has been thought to be a holy site, believed to be a holy site by the plaintiffs here for many, many, many, many years. Certainly. Yes. And so isn't that a factor to consider when you're determining whether there's a substantial burden? Your Honor, it goes to the sincerity of their beliefs. And here we don't challenge the sincerity of beliefs, but certainly in other cases and other times the government has challenged, for example, the sincerity of people who claim to be Rastafarian so that they might possess marijuana. Sometimes the courts have found that the person professing Rastafarianism is not, in fact, a religious practitioner. Here, the fact that these beliefs are many hundreds of years old. What I don't understand is why would the government go ahead with something like this and take this sewage water and use it to make snow? If it's a holy place, it's got to be terribly offensive to people. Well, Your Honor, first of all, this is not sewage water. The treatment renders it completely distinct. It's sewage water. It was at one time. At the point that it was treated, it is no longer sewage water. It's still sewage water. That said, to answer your first question, the Forest Service has proceeded with this project because its multiple use mandate requires it to engage in activities on the public lands, which will sometimes produce conflict with the interests of certain users. Are you saying the Forest Service would be violating its governing statutes if it turned down this project? You said this requires that the government grant the approval to this project. You can't quite mean that, can you? I didn't quite say that. The multiple use mandate requires, for example, developed outdoor recreation. The government could have rejected this project consistent with its governing statutes, certainly. But those governing statutes direct the agency to take actions such as this, and its determination was not taken lightly. It was done after many years of study and many hundreds of pages of documents, not only scientific but also cultural and anthropological. Counsel, I'm still troubled by the definition of substantial burden. You've heard some suggested definitions from the other side, and you heard Mr. Trope saying that coercion is not part of the process. How do we get at what the definition is? How do we know what a substantial burden is? I don't think that characterization is quite accurate. Coercion is certainly part of the process, and in the Supreme Court cases in which it is held that a substantial burden was imposed, it was because of either direct imposition of criminal penalties or because a person was denied government benefits. And in the denial cases, the court has said, that's really indistinguishable from placing a fine on them, imposing a criminal law. Well, both of those have some coercive effect. And in the cases that the plaintiffs rely on, the plaintiffs in their brief repeatedly cite war soldier, for example, one of this court's cases. And that's an example where the court's opinion itself says there was coercive effect in place on the prisoner. He was repeatedly punished for trying to adhere to his religious beliefs. And that is the type of government action which implicates RFRA and the free exercise clause. Direct action upon a prosecution. But that is not an action strictly involved in the government's own property. That is the action by the government that involves coercion of a human being. Yes, sir. Can you follow up on your answer to Judge Fletcher's question? I think the same question to the scanning that I have from the other end. What is an example of an action involving government land that in your view would nevertheless implicate RFRA? And put aside situations where this involves actual coercion of a human being. Well, to give you one example that the Lane court proposes is a hypothetical. Were there a sacred site on government lands which had no other use but as a sacred site and people journeyed there for some religious ritual, and the government put a fence around it and issued a closure order which there are criminal penalties associated with and said no one can go to this site on government land. The Supreme Court said that would raise very different constitutional questions and that sounds like the type of substantial burden the courts had previously found to implicate the compelling interest test. And that's the type of thing which might occur on federal land. It would be a government action, but it would nevertheless trigger the RFRA. The idea there would be that it would be an action directed with an animus towards that religion. Precisely, or towards all religious adherence. It need not be discriminatory. How about the following example? Finally giving up on being able to persuade Nevada, the government decides to move the nuclear waste disposal site from Yucca Mountain to the San Francisco Peaks. And we now are doing disposal of all of our high-level nuclear waste at the San Francisco Peaks. So would that be a substantial burden? I'm not yet to the question of whether or not there's compelling interest. Because of course that would justify it, even if it were a substantial burden. Would that be a substantial burden in your view? That's a much more difficult case. It's actually much more analogous to the snowball. It's the type of thing where an action is taken which doesn't prevent access and doesn't impose anything on... Well, can you imagine the fact that there's going to be easy access to Yucca Mountain once that gets underway? I don't think so. No, perhaps not. And perhaps by closing off the mountain, you might then have substantially burdened... And then they were doing... The reason I ask it this way to distinguish from the previous example, that does not sound as though that has been done with hostility toward any particular religion. It's rather been done because the government thinks that as a site that it needs for this other purpose. And that's the reason why the lien court says that it's important that this is on government land, that the government's rights to its own land can't be taken away or diminished by the beliefs of other people. And precisely for that reason, that it has to be allowed to make... And that goes to whether or not there's a compelling governmental interest, not whether there's a substantial burden. No, Your Honor, I think it does apply to substantial burden inquiry. I mean, it's the distinction between the type of governmental action which directly is affected upon a religious practitioner because of their beliefs or which compels them to act contrary to those beliefs versus a governmental action which has nothing to do with those beliefs and is taken on its own land or the management of its own internal affairs, but which nevertheless, because of what people believe, either causes them to believe something different or causes them to no longer believe that those beliefs are valid and therefore offends and perhaps very greatly, as the Yucca Mountain example would, very greatly offend those religious beliefs. But the government cannot... You said over here... Sorry, Your Honor. Some of us over here. Yes. It was worse when we were 15. You said at the outset that coercion was an element of the substantial burden analysis. I think the question was asking whether, and if it wasn't, I'm going to ask it, is coercion inherent in any answer, yes, that has a substantial burden? I don't see the coercion, for example, in your accession to Judge Fletcher's hypothetical of storing nuclear waste. Assuming that they aren't prevented from coming to the mountain by security reasons, just assume, but now there is nuclear waste stored under it. Would that be then subject to a substantial burden analysis, even though there wasn't any act of overt coercion or criminal penalty? That, Your Honor, would not be a substantial burden. Even if there's nuclear waste buried under it. And the reason is because, as you have pointed out, in all the cases in which the courts have found a substantial burden, there has been some element of coercion. I wasn't pointing it out. I was acceding to your claim that it was, but I was trying to find the coercion in the Yucca Mountain hypothetical. So now you're saying it's not a substantial burden unless by putting the Yucca Mountain facility now in the San Francisco's, it restricts access? No, Your Honor. Well, perhaps that to deal with the hypothetical in detail, but what I'm saying is that if you were simply to bury nuclear waste underneath the San Francisco peaks, use something grossly offensive to many religious practitioners, it would not be a substantial burden because it lacks that element of compulsion or coercion. Suppose the government enacted a law or regulation that said tribes cannot go on the land to gather certain kind of plants that are used for rituals. Would that be a substantial burden? I believe it would be a substantial burden, Your Honor. I believe that's a simple access to religious materials case, especially if the law singled out tribes or certain plants or certain religious rituals, and then you would have to present a compelling governmental interest for that law. You mean if the government said no one can go on government land and gather plant material, that would be a substantial burden? Yeah, I think that's a better example. That might not be a substantial burden. I'm not competing examples here. I understood your question to Judge Silverman's example, and hypothetical being that this, if I understood the question correctly, was limited to Indian tribes? Anybody. If the law said... I was really just trying to clarify the question. So the question, I guess, just someone was asking, was let's say the government said nobody can get on the mountain and gather herbs at all. I think that would be much closer to imposing a substantial burden because it would implicate access to the public lands, and that's part of what the government and its management of public lands has to provide, and it implicates, as the Ling Court identified, a difference. Can I just... Don't tell us anything at all. What's the answer to the question? I would say yes. I don't know what close means on this side or close on that side. I'd say yes. I have no idea what you're saying. That's a substantial burden. That is a substantial burden. Your complete denial of access to a religious area. Can I run something by you then? In our Guerrero case, we formulated a substantial burden test that puts substantial pressure on an adherent to modify his behavior and to violate his beliefs, citing Thomas, United States Supreme Court, including when, if enforced, it results in the choice to the individual of either abandoning his religious principle or facing criminal prosecution, citing Brownfield. And it must be more than an inconvenience. Now, to go back to frame it specifically, in answer to Judge Silverman's hypothetical, it's a prohibition on gathering plants from a particular site, and presumably that prohibition is enforceable by criminal penalties so that if historically an Indian tribe has been gathering native plants there which have been endemic to its religious practices for hundreds of years, and now they can't go there, and if they do go there, they would be criminally sanctioned. Then would that, in Judge Silverman's hypothetical, that would be a substantial burden? That sounds like the type of substantial burden the courts have previously found, yes. Okay. And do you agree with the formulation of substantial burden test as outlined in our Guerrero case? Yes, Your Honor. I think that's the correct formulation of the test, the one that this court ought to apply, and that is not a newly formulated test in that opinion. That is the test applied by the Supreme Court in previous cases, which this court was recognizing and reciting. If you had a rare species. What's the difference with this case, then? I'm sorry, Your Honor? I don't see how that's different from this case. That's different from this case because in this case there is no restriction of access, and, in fact, there is provision of access above and beyond what non-religious practitioners are given. I see. What you're saying is if the government says you can't go on the mountain to gather any plants, that's a substantial burden. But if the government goes and burns down the mountain so there are no plants to gather, that's not. That's correct, Your Honor. And though it sounds harsher in the second example, the reason for that is because, as the Supreme Court recognized, to say that it is to say that anything which offends the beliefs of people whose beliefs rely on certain actions on government land provides no limiting principle for this court or for the government agencies. If the government treats the land in a manner that's offensive, if the people look upon the land as sacred, how would you classify that? That has never been a substantial burden under the Free Exercise Clause, and therefore it is not a substantial burden in RFRA. Now, I don't understand quite how you get around, once you've accepted Guerrero as an appropriate sort of gloss on the standard. Testimony, for example, from Mr. Larry Foster, where he says it would be a devastation, and testimony from Mr. Ney that they can't practice their religion anymore. I mean, how is that not a substantial burden? I mean, that's the testimony, and you can tell me you don't believe it, but if that's what they say and if we are supposed to believe it, how is that not telling us that that is not a substantial burden? Your Honor, I believe that they believe it. But as the court said in Ling, that they believe their prayers will not be answered, that their religious practices have no meaning, that their religion will be devastated, to use the terms of the testimony, is not of the nature of substantial burden. Substantial burden is not an issue of degree, where if the government makes you more upset, more offended, then it becomes substantial. It is the nature of the burden that's important. So if it's spiritual, it doesn't count. Is that what you're saying? No, Your Honor, it's not what I'm saying. But that's the idea behind the Supreme Court's delineation. Let me clarify this through a hypo that you gave us. If it's spiritual, then that's not a substantial burden. No, Your Honor. A lot of religious practices could be substantially burdened that are spiritually required, and certainly a lot of spirituality works into this. And if it's an insult to a religion, that's not a substantial burden. If that is the exclusive impact that the government's action has, then that is not a substantial burden. And that would be because of the Supreme Court's language on offensiveness. Exactly. Let me ask you about your hypo. A lot of religions have holy places, and a lot of religions have rules that prohibit non-adherence to the religion from entering the holy places. It's common to many of them. I don't know if Indian religions have that or not. Suppose that a Native American religion does have a holy place that non-adherents are not allowed to go to, or some other religion has a holy place like that on federal land. It sounds to me from the hypo you gave us before as though you would concede that even though it's on government land, RFRA requires that the government let the adherents of that religion go to that holy place and not exclude them. I'm wondering whether in order to avoid the deep offense to the religion if non-adherents go to the holy place and trample on the ground with their unholy feet, whether RFRA requires the government to limit access to the holy place to adherents of that religion? Your Honor, you've proposed the exact hypothetical which presents why the government can't operate under the principle the plaintiffs are proposing, that it cannot offend religious belief in the management of its land because many religious beliefs are mutually exclusive or are contradictory and would require the government to do exactly as Judge Kleinfeld has proposed, restrict access to allow one set of practitioners or to allow access for another. It simply cannot operate this way. This is the slippery slope which the Court rejected in Roy and which the Court relied on in Lange in saying that it's particularly true in the management of its own lands. I see I'm out of time. The statute, to me, it seemed pretty clear. It gives you the exception. Government may substantially burden a person's exercise of religion only if it demonstrates that application of the burden to the person is in furtherance of a compelling government interest and it is the least restrictive means of furthering that compelling government interest. That's right, Your Honor. And I don't understand what the compelling government interest is here. Well, Your Honor, I'll be very brief, but it is as outlined in our briefs. I mean, is it the money that the government's getting? No, Your Honor, it is not. It's the provision of a consistent, reliable, developed outdoor recreation which the Forest Plan requires it to provide, which Congressional Statutes and Executive Orders Why do we need to send sewage water up there, reclaimed water? Your Honor, I refer you to the Record of Decision which describes that that's the only source of water. Water that we don't want our children to drink? We don't want to drink? We don't want them to eat it or anything? Well, Your Honor, I'll have to let my counsel address that on the NEPA issue as to the safety of this water, which I'd like to sit down and let her do now. I add only to that that... You don't want to answer my question, is that it? I do want to answer your question, Your Honor, but I'm required to give her some of my time as well. I'll give you the short answer, which is that we think that the original panel's opinion incorrectly invalidated the EIS because it's not true that the EIS doesn't contain the science to support the Record of Decision's conclusion that this water was safe. That was the conclusion. It was explicitly made by the Record of Decision, and the science is, in great detail, contained within the EIS. And with that, I have to sit down. Good afternoon, Your Honors, and may it please the Court. My name is Kate Stetson. I represent the Arizona Snow Bowl. I'd like to use the time that I have to turn to the NEPA issue, and in particular to the question, Judge Silverman, that you posed, Mr. Shanker. Just to reorient the Court over to NEPA, the District Court concluded that the Forest Service had performed a fully adequate review of the environmental effects, including the health effects, of this proposed action. The panel concluded that the Forest Service had inadequately examined the health effects of ingesting this quality reclaimed water that was made into snow. The panel decision was error, and if it stands, it threatens to impose a far more stringent standard on agencies than this Court's previous Ms. Stetson, why don't we just get past that whole issue? Because the issue was not raised in the agency. The First Amendment complaint did not raise the claim of deficient or any danger for ingestion. A motion to amend the First Amendment complaint was made in the trial court. It was denied. That ruling has not been appealed. And so, therefore, it's not before us. Your Honor, that is absolutely correct. Thank you. The Navajo- Is there any other skiing facility, garment property that we know of, or private property that uses reclaimed sewage water to make snow? Yes, the White Mountain Apache, one of the plaintiffs, uses reclaimed water to make snow. But on the NEPA point, if- And how is that water reclaimed? How is it reclaimed? What processes does it go through? Primary, secondary, tertiary? They have, I believe, a secondary wastewater treatment plant on site. This water comes from a Class A plus facility in Flagstaff called the Rio de Flag. And if, Your Honors, you do move past the waiver issue, which we think is substantial, and move to the merits of the NEPA argument, what you will find if you review the EIS, which I would commend to you as an exemplary document, is that the Forest Service basically performed four different sets of analyses on the health effects of reclaimed water. It began, Judge Silverman, with the ADEQ. If you look at the notice- It says it's suitable for snowmaking. It doesn't say it's necessarily suitable for skiing in or playing in. I mean, it could be used for decorative snow or other kinds of snow. Well, Your Honor, what the ADEQ says, and I would refer you to the Notice of Final Rulemaking that issued February 16, 2001. There are excerpts of it in your supplemental excerpts of record, but you can also find it in the Arizona Register, page 872, 876 to 877, and 881 to 883, talk about the uses to which high-quality Class A or Class A-plus reclaimed water may be put. And the reason that certain uses are- certain classes of water are designated for particular uses has to do, the ADEQ says, with the level of anticipated exposure of the public to that water. Let me ask you this. Yes, Judge Butcher. ADEQ does not say this is potable water, correct? That is correct. What ADEQ says- So, let me make- So, going from the ADEQ says you're not supposed to drink it and you're not supposed to eat snow from it, correct? Well, let me- Is that a yes or a no? What ADEQ says with respect to all reclaimed water, no matter what the class, Class C, Class A, or in between, is that you're not supposed to drink it. But that actually- Okay, that now- Okay, that- What I'm really after is not whether we understand whether it's safe to drink it or to eat it. We know that it is not. And that's, I think, quite clear from the EIS, and the EIS, I think, is fully sufficient on that point. What I don't find in the EIS is any evaluation of the likelihood, particularly that children will, in fact, ingest it. We're not only going to have reclaimed water using to make snow on the ski area. It's going to be largely adults, maybe some kids on the lower slopes. We're going to have snowmaking where they're going to be in the play area. We're going to have children doing this. And I see nothing in there that tells us how likely it is that the children playing in the snow are actually going to eat it. Your Honor, I think it is always possible when a court reviews a NEPA analysis to- Am I wrong that there's nothing in there that studies how likely it is that the children will eat the snow? Yes, Your Honor. Where does it say that? In the Record of Decision and in the Volume 2 accompanying the- And what does it say? Let me refer you also to the- What does it say? What it says is that the risk of ingestion is small because of the seasonal nature and because of the fact that this water has been shown to be safe. And that leads me to my second- I'm sorry, that does not follow. The fact that it's safe has nothing to do with the fact that it will be ingested. The question is how much will the children ingest it, and it's nowhere in the EIS. Your Honor, I have to resist you on this point. What the FEIS says- I mentioned there were four points of analysis, and we've gotten to one, the ADEQ. What the FEIS also says at page 3177 of the final Environmental Impact Statement is that the Forest Service reviewed detailed studies of the health effects of ingesting, directly ingesting, reclaimed water. Those studies took place in Denver and in South Africa, and modified studies took place in L.A. and Orange Counties. That's point two. Point three was the data that was collected with respect to this particular facility, and you can find that at page 3176 to 186 and page 3206. And I would commend that last site to you in particular because it talks about the quarterly monitoring reports that this particular facility puts forward, and it concluded that this facility, this Class A-plus reclaimed water facility, produces water that is in compliance with Arizona's drinking water standards. From that, those three predicates, plus one more, the scientific analysis that was performed by the Army Corps of Engineers and two or three other outfits discussing specifically what happens to reclaimed water when it's made into snow and concluding that that water becomes even further purified by those processes. Is that what you're telling us? What I am telling you, Your Honor, is that this is safe, and that's an excellent question because- No, no, you just said it was suitable for drinking. That's potable water. This has been, I think, a persistent- Well, why can't you just answer that? I'm interested in that question. Whether it's drinkable? Yeah. I've drank it. That doesn't mean anything to me. You'd probably swallow a sword if it would help you. The question that the Forest Service has to answer, and I want to be very clear about this, is not is this water drinkable. The question that the Forest Service had to answer and that this Court has to review is whether the Forest Service took an adequately hard look at the potential environmental effects of this water. So holding them to the standard of proving that this Class A-plus reclaimed water, which, by the way, tests as drinkable, is drinkable, is not the Forest Service's purview, nor is it yours. What you have- Are you saying that the water tests as drinkable? I am saying that at page 3-206 of the FEIS- I'm sorry, say those again. 3-206, the Forest Service concludes precisely that. But that's not even the standard. When we go back and reread this, I think we will find that your argument on this point is double talk. This is not potable water. The standards to which they purify for A-plus does not result in potable water, and Arizona requires that there be signs posted wherever it's used saying it is not potable. But that speaks exactly to my point. The Forest Service's charge in this case, in its NEPA analysis, which was a textbook example of a good EIS, was not to show that this water was drinkable. It was to show that it took a sufficiently hard look at the environmental impacts of the use of reclaimed water to be made into snow. It looked at the ADEQ. It looked at the data. Let me get at the children playing issue that several of my colleagues have raised. When I was a kid, we went swimming at summer camp. Beavers use the streams as bathrooms. So any lake fed by a stream has giardia and E. coli in it. Tell our kids, don't drink the water. Little kids, they always splash each other, drink a little water. Do those summer camp lakes now have to be purified to where it had to be suitable water to just put in a glass at the mess hall in the summer camp? No, I don't believe they do, Your Honor. And if I can ask the Court's indulgence, I know I'm over my time. Just give me the name of that summer camp so I don't send my grandkids. Well, I would give you... I'll tell you what I'll give you the name of is Big Bear Mountain, which makes an immense amount of snow and which draws that snow-making water directly from Big Bear Lake. This water has been reviewed by the Forest Service up one side and down the other as part of its thorough environmental review, and it was found at page 29 to 30 to pose minimal health effects. I would suggest that it's the question... I've eaten the snow at Big Bear often, usually when I did a face plant. I think your time is up. There are no further questions. Thank you, Your Honor. We've helped you use up your time. If one counsel wants to take a minute for a bottle, you may, mostly to see whether any of my colleagues have questions. The clock is ticking. Well, perhaps not. The case is signed. You will stand submitted. Thank you.
judges: Kozinski , Pregerson , O'Scannlain , Rymer , Kleinfeld , Silverman , Fletcher , Fisher , Clifton , Bea , Ikuta